**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Civil Division**

| | |
|---|---|
| **JEREMY WHITE** | \* |
| **2935 Thorney Croft Dr.** | \* |
| **Indianapolis, IN 46266** | \* |
| | \* |
| *Plaintiff*, | \* |
| | \* |
| | \*  **Case No.: 1:23-cv-2890** |
| | \* |
| **v.** | \* |
| | \* |
| | \* |
| **HOUSING AUTHORITY OF** | \*  **JURY TRIAL DEMANDED** |
| **QUEEN ANNE'S COUNTY** | \* |
| **205 E. Water Street, Suite 100, P.O. Box 280** | \* |
| **Centreville, MD 21617** | \* |
| | \* |
| *Defendant*. | \* |
| | \* |

**COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES**

COMES NOW, Jeremy White, Plaintiff, (hereinafter "Plaintiff") by and through undersigned counsel, and complains against Defendant, Housing Authority of Queen Anne's County, (hereinafter "Defendant" or "HAQAC") and in support thereof states as follows:

**INTRODUCTION**

1. Beginning in or around 2017, the Plaintiff was subjected to harassment, discrimination, and retaliation by the Defendant and its agents due solely to the fact that he was a young African American man who was attempting to remedy racial inequality in the Defendant's rental properties. Plaintiff endured this treatment for years until his resignation in 2019. Defendant was fully aware of what was occurring and did nothing to stop its disparate treatment of Plaintiff.

1

2. This is an action authorized and instituted pursuant to Section 1983 of the Civil Rights Act ("Section 1983") and the Civil Rights Act of 1866, Section 1981(a) ("Section 1981") for the Defendant's unlawful harassment, discrimination based on race (African American) and retaliation against the Plaintiff, including, but not limited to, Defendants' unlawful and discriminatory preference and treatment, as well as retaliating against Plaintiff for his statutorily-protected activity.

## JURISDICTION AND VENUE

3. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Section 1981 and Section 1983, to redress and enjoin employment practices of the Defendant.

4. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

5. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

6. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transact substantial business in this District, and Defendants maintain employment records related to this action in the District of Maryland.

## NATURE OF THE ACTION

7. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

8. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of his constitutional and statutory rights.

9. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

10. Plaintiff, Jeremy White, is an African American male who resides in Marion County, Indiana.

11. Defendant is a quasi-governmental agency with the mission to provide a broad range of housing-related services to assist residents of Queen Anne's County, Maryland to acquire and maintain decent, safe, and affordable housing.

12. Plaintiff was employed as Executive Director for the Defendant from August 2016 to November 2019.  In that position, Plaintiff acted as Secretary of Defendant's Board of Commissioners (the "Board") and worked with Board members to implement policies for the benefit of residents of Queen Anne's County.

13. During the relevant period, Defendant employed Plaintiff, Jeremy White.

14. During the relevant period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections of Sections 1983 and 1981 of the Civil Rights Act.

## FACTUAL ALLEGATIONS

15. Plaintiff, Jeremy White, was employed as Executive Director for the Defendant from August 2016 to November 2019.

16. As part of his responsibilities, Plaintiff was responsible for managing tenant housing, supervising and controlling Defendant's payables, receivables, cash, and other assets associated with all internal and external financial operations.

17. Plaintiff also wrote and signed all checks on behalf of the Defendant, including all employee payroll checks for other employees and himself.  Plaintiff also wrote and signed checks that were issued to him for living expenses and a car allowance in accordance with his employment contract.

18. All of Plaintiff's financial decisions were subject to an annual audit by a private company hired by the Board and no problems were ever noted.  All financial transactions were independently reviewed during the annual audit by a third-party auditing firm, as required.

19. Plaintiff also consistently received the highest ratings on his performance evaluations from the Board every year.

20. During his tenure as Executive Director, Plaintiff worked with Board members Chair James Hynson (African American male); James Holley (African American male-now deceased); Tonya Brown (African American female); JoAnne Brice (African American female); LaResse Cathey (African American female); Richard Cira (Caucasian); and Robert Udoff (Caucasian).

21. In or around 2017, Plaintiff noticed discrepancies in the Defendant's handling of properties that consisted mostly of communities of color.  Plaintiff uncovered evidence that the Defendant charged $50.00 a month higher rents for the same or similar properties in its predominantly minority occupied communities as compared to its majority Caucasian communities. Further, Plaintiff recognized a pattern of not addressing maintenance issues in minority communities as quickly or efficiently as issues in Caucasian communities.

4

22. After having realized the disparate treatment, Plaintiff sought to approach the Board with evidence of what was occurring in the hopes that the issues would be addressed through a rent equalization and maintenance structure.

23. Initially, all Board members agreed to the housing equity proposal.  However, Mr. Cira was displeased with Plaintiff's assertion that the disparity was racial in nature and voiced his displeasure by yelling and pointing angrily at Plaintiff.  Soon after, Mr. Cira, who is Caucasian, began a campaign to discredit Plaintiff's concerns and frustrate attempts to implement rent and maintenance equalization.

24. Mr. Cira began to send harassing and threatening emails to Plaintiff in an effort to pressure him into reversing the Board Approved Resolution to equalize rent in rental units managed by the Defendant.

25. On or about September 18, 2017, at the Defendant's monthly Board meeting, Mr. Cira expressed his desire to rescind his vote for the rent in measure.  He expressed that he was unaware that Plaintiff would be mailing out notice letters to residents because he had privately expressed to the Plaintiff that he wished to rescind his vote.  He was reminded by another Board member that he had to publicly rescind his vote for it to take effect and that the Board as a whole had approved a motion for the rent increase and that Plaintiff had acted accordingly.

26. At the same meeting, Mr. Cira expressed a desire for a review of the Defendant's financials because he was unaware of the situation.  Plaintiff reminded Mr. Cira that the Board was given a detailed account of the Defendant's financials during the budget cycle in June 2017. Mr. Cira was also reminded that he voted to approve the Fiscal year 2016 Budget Revision and the Fiscal year 2017 Operating Budget.

27. Mr. Cira also stated that he did not like Plaintiff's proposal for the Rent Increase Hardship Policy partly because he did not like the name. Plaintiff responded that "Hardship Exemption" is a common term used by the Department of Housing and Urban Development ("HUD") and most housing authorities.

28. At this point, Plaintiff realized that Mr. Cira was targeting him because he had revealed the racial discrepancies in the Defendant's rental units and was attempting to rectify them. Prior to Plaintiff bringing the racial disparity to light, Mr. Cira had never displayed any hostility or animosity towards Plaintiff. Their relationship was cordial, and this was the first time Mr. Cira had engaged in any sort of misconduct directed at Plaintiff.

29. At a subsequent Board meeting, on or about October 30, 2017, Mr. Cira formally rescinded his vote. Plaintiff presented spreadsheets that would aid in determining the fair market rates for rental units. He revisited the budget approval that was passed unanimously and highlighted the motions made by Mr. Cira to approve.

30. In response, Mr. Cira presented a document that he referred to as the current operating budget. However, it was determined that that document was not the current budget. When Plaintiff inquired as to where Mr. Cira had obtained the document, Mr. Cira did not respond. Mr. Cira proceeded to make a motion to suspend the state of affairs until the Board addressed the public, but the motion was not carried.

31. Since the initial Board meeting when Plaintiff advocated for rent equity, Mr. Cira had continued to send threatening emails to Plaintiff. Throughout various Board meetings, Mr. Cira would tell the Plaintiff to "do as [he] was told or suffer consequences," or words similar to that effect, to "shut up," would point his finder in Plaintiff's face, and would

throw papers at Plaintiff.  All of this occurred in front of the other members of the Board at public meetings and caused Plaintiff humiliation and emotional and mental harm.

32. As Plaintiff continued to advocate for rent equity, Mr. Cira, with the aid of Commissioners Christopher M. Chorchiarino and Mark Anderson, organized and paid for buses to bring protestors from Defendant's primarily Caucasian rental properties to Board meeting with the intent that these protestors would interrupt Plaintiff when he tried to speak in an attempt to prevent him from going forward with the vote.

33. The rent equity proposal was eventually passed by the Board on or about November 2018, and the harassment intensified.

34. The Commissioners refused to reappoint an eligible Board member to replace the expiring term for LaResse Cathey (African American) in order to appoint another Caucasian member to the Board.

35. In or around early 2019, Plaintiff proposed a $500,000 mold remediation project in rental properties primarily comprised of people of color.  Plaintiff had made the Board aware of mold since 2016 and was concerned about the potential health threat to tenants.  Further, this posed potential financial risk to the organization and Plaintiff had been tasked into inquiring about the cost of addressing the mold problem in the communities.

36. Shortly after the mold remediation project was approved by the Board, Mr. Robert Udoff, Caucasian, joined the Board.  Mr. Udoff immediately joined efforts with Mr. Cira to pressure Plaintiff into reversing the Board approved resolution by frustrating funding efforts for the mold remediation.  Ultimately, this harmed already vulnerable communities of color solely because Mr. Cira and Mr. Udoff had a vendetta against Plaintiff for not

reason other than that Plaintiff was a young and competent African American man who was attempting to remedy inequality within the Defendant's organization.

37. As a result of their actions, Plaintiff filed a federal fair housing complaint with HUD on behalf of the minority tenants in or around May 2019 because he believed that the mold would adversely impact the health and safety of minority residents. Further, the Defendant could be held legally culpable for its failure to remedy the issue.

38. In an effort to have witnesses to Mr. Cira, Mr. Udoff and the Defendant's Commissioners treatment of Plaintiff, Plaintiff began to invite members of the NAACP to attend Board meetings.

39. A few days after Plaintiff filed his complaint with HUD, Mr. Cira and Mr. Udoff began bombarding Plaintiff's office with hundreds of emails and telephone calls in an effort to so overwhelm Plaintiff's office that his efforts to complete his duties to tenants and community partners would be frustrated.

40. Plaintiff was constantly told that if he failed to do what he was told, the "commissioners will do what they have to do," or words similar. Mr. Cira and Mr. Udoff continued to pressure Plaintiff to stop his endeavors.

41. Months of emails, telephone calls, verbal threats, and harassment, began to take an emotional and mental toll on the Plaintiff. Plaintiff began to lock his office door and work remotely as often as possible to help temper his exposure to the hostile work environment he had been subjected to.

42. Still, Plaintiff carried on with his responsibilities and in or around 2019, tensions escalated when Mr. Cira and Mr. Udoff would humiliate Plaintiff at Board meetings by pointing fingers in Plaintiff's face, lunging at him, and throwing papers at him while he spoke. This

was in full view of other members of the Board.  At no point did the Defendant attempt to rectify or address this behavior.

43. On one occasion, when Plaintiff plainly told Mr. Udoff that his treatment of Plaintiff was discriminatory and harassment, Mr. Udoff attempted to physically assault Plaintiff and had to be restrained.  Mr. Udoff became so aggravated during this encounter that he urinated on himself and the Board meeting had to be adjourned.

44. While the Plaintiff endured this treatment, Defendant was aware of the treatment.  The majority of Board meetings were public and other individuals attended that can attest to the treatment of Plaintiff.  Despite this, Defendant did nothing to address the problems or aid Plaintiff in any way.

45. Throughout 2019, Plaintiff raised the issue of his treatment to the Board during Board meetings.  He described the intimidation and threats that he faced as well as the toll the harassment and discrimination was beginning to take on him.  Yet again, Defendant did nothing.

46. The intense stress Plaintiff was forced to endure eventually manifested physically and Plaintiff was required to seek medical care because of massive headaches and a struggle to focus.  Plaintiff's doctor recommended that Plaintiff take a leave of absence from work. Plaintiff chose to heed his doctor's recommendations in or around November 2019.

47. Before he went on leave, Plaintiff submitted his resignation on or around October 12, 2019, initially with an effective date of February 2020.  Even with his resignation, however, the harassment did not relent, and Plaintiff chose to leave Defendant's employment on of about, November 23, 2019 after submitting a second resignation letter.  The bullying,

intimidation, threats, and harassment by members of the Defendant's Board was finally too much for Plaintiff to take.

48. At the time of his resignation in or around October 2019, Plaintiff was entitled to compensation for 853 hours of vacation time and 132 hours of personal leave. Based on his salary, this meant that Plaintiff was entitled to over $50,000 as payment for compensable leave.

49. Per Defendant's policy, Plaintiff issued checks to himself to cover the compensation owed with staggered payments to minimize the financial impact on Defendant. The Board was aware of the payments as evidenced by the fact that Board Chairman James Hynson contacted Plaintiff and asked him to wait to cash the remaining checks.

50. During his conversation with Chairman Hynson, Plaintiff was assured that he would be compensated for all vacation and personal leave hours at a later date. Based on the Chairman's assurances, Plaintiff voluntarily rescinded the last two checks that he had deposited.

51. Defendant never fulfilled the Chairman's promise to reimburse Plaintiff, despite the fact that Plaintiff was entitled to be paid for outstanding vacation and personal hours or retirement contributions of ten percent of his annual salary per Plaintiff's employment contract and Defendant's own policy and practices.

52. Instead, Defendant defamed Plaintiff by accusing him of mishandling public funds publicly via newspaper and requiring that Plaintiff to pay for reimbursable expenses necessary to effectively complete the duties of his position as Executive Director.

53. But for Plaintiff's race and his decision to oppose Defendant's discriminatory practices against minority residents, Defendant and its agents would not have retaliated against

Plaintiff, constructively discharged him, and denied him the same term, conditions, and benefits of employment as the Defendant's other employees.

54. Defendant had a duty to Plaintiff to address racial discrimination not in its property practices, but also when it occurred as harassment against its own employees by other members of the organization.

55. Instead, Defendant's failure to address issues that it was well aware of resulted in Plaintiff suffereing emotional distress such as anxiety, depression, embarrassment, humiliation, and sleeplessness solely because Caucasian members of the Board did not take well to a young African American man's attempt to remedy racial inequity.

## COUNT I

### VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT – RACE DISCRIMINATION, DISPARATE TREATMENT

56. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

57. Plaintiff brings claims of race discrimination and disparate treatment against Defendant and its named Responsible Management Officials, for its violations of 42 U.S.C. § 1981 through 42 U.S.C. § 1983 for the deprivation of his property and liberty interests as protected by the 14th Amendment to the U.S. Constitution and these federal statutes.

58. Section 1983 provides an individual the right to sue state government employees and others acting "under color of state law" for civil rights violations.

59. The Defendant, and its Responsible Management Officials, under 42 U.S.C. § 1983 are persons who acted "under color of state law."

60. Defendant unlawfully deprived Plaintiff of his due process rights in violation of Section 1981 of the Civil Rights Act.

11

61. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

62. Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is African American and is considered a member of a protected class as stipulated under Section 1983 of the Civil Rights Act. Additionally, Plaintiff effectively and efficiently executed his duties to the Defendant and always received the highest performance reviews. The Plaintiff suffered an adverse employment action directly related to his position of being a protected class member as recognized under Section 1983 of the Civil Rights Act.

63. Plaintiff is a member of a protected class as an African American man.

64. Because of his race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Section 1983 of the Civil Rights Act.

65. Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

66. Defendant knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his race.

67. Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to her race.

68. Defendant reprimanded Plaintiff in a way that deprived him of workplace safety and otherwise adversely affected his status as an employee because of his race.

12

69. Other employees who were similarly situated, but were non-African American or Caucasian individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

70. Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

71. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

72. Further, Defendant's treatment and actions are ongoing.

73. Similarly situated non-African American or Caucasian employees were not subjected to the same, similar, or adverse treatment like Plaintiff, and have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

74. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

75. Defendant discriminated against Plaintiff because of his race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

76. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

77. The acts described above are part of an institutional practice or custom, constituting an official policy of Defendant to discriminate against and harass employees who advocated for racial equity.

78. At all times relevant hereto, Defendant acted pursuant to a custom or policy of the Housing Authority of Queen Anne's County.

79. Defendant failed to adopt clear policies and failed to properly train its management in handling, managing, and protecting employees.

80. Plaintiff's allegations clearly show a custom of discrimination as required by Section 1983.

81. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

82. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

83. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

84. The Housing Authority of Queen Anne's County must comply with Section 1983 of the Civil Rights Act, but by and through their conduct, have violated Section 1983 of the Civil Rights Act.

## COUNT II

### VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT – RACE DISCRIMINATION (HOSTILE WORK ENVIRONMENT)

85. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

86. Plaintiff brings claims of race discrimination and hostile work environment against Defendant and its named Responsible Management Officials, for its violations of 42 U.S.C.

§ 1981 through 42 U.S.C. § 1983 for the deprivation of his property and liberty interests as protected by the 1st and 14th Amendments to the U.S. Constitution and these federal statutes.

87. Section 1983 provides an individual the right to sue state government employees and others acting "under color of state law" for civil rights violations.

88. The Defendant, and its Responsible Management Officials, under 42 U.S.C. § 1983 are persons who acted "under color of state law."

89. Defendant unlawfully deprived Plaintiff of his due process rights in violation of Section 1981 of the Civil Rights Act.

90. When hostile work environment is alleged to have occurred as a result of unlawful discrimination, a complainant must show that: (1) he belongs to a statutorily protected class; (2) he was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on his statutorily protected class; (4) the harassment affected a term or condition of employment[1] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

---

[1] The phrase "terms, conditions and privileges of employment" is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

91. The actions and conduct of the above-described perpetrators as set forth herein created a racially hostile, offensive and intimidating work environment and detrimentally affected Plaintiff.

92. The actions and conduct by the above-described perpetrators as set forth herein were severe and pervasive and based on Plaintiff's race as an African American and constituted discrimination based on race.

93. The actions and conduct described herein would have detrimentally affected a reasonable person of the same race in Plaintiff's position.

94. Defendant knew or should have known of the racial discrimination described herein. Defendant has failed to address the problems and further failed to implement effective and appropriate measures to stop the racial discrimination.

95. By failing to conduct a prompt and thorough investigation of Plaintiff's allegations of racial discrimination; failing to redress the racial discrimination of Plaintiff by Mr. Cira, Mr. Udoff, and other Commissioners; by consciously failing to protect Plaintiff from racial discrimination within the Defendant's organization; and by punishing Plaintiff for his resignation due to racial harassment by not paying out the benefits he was entitled to, Defendant exacerbated the racially hostile work environment suffered by Plaintiff and intentionally discriminated against Plaintiff in violation of Section 1983 of the Civil Rights Act.

96. Defendant's actions, and failure to act, amounted to race discrimination under Section 1983 of the Civil Rights Act and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment abrogates the states' Eleventh Amendment sovereign immunity. Section 1983 of the Civil

Rights Act, through the 1972 amendment 16 known as the Equal Employment Opportunity Act ("EEOA"), provides an enforcement remedy for equal protection violations of state employees through Section 5 of the Fourteenth Amendment.

97. As a direct result of Defendant's unlawful acts of racial discrimination, Plaintiff has suffered damages, including but not limited to lost wages and emotional and mental distress.

## **COUNT III**

### **VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT – RETALIATION**

98. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

99. Section 1983 of the Civil Rights Act of the Civil Rights Act prohibits an employer from retaliating against employees for engaging in protected conduct. To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory or retaliatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

100. A First Amendment retaliation claim under Section 1983 consists of three elements: (1) the plaintiff engaged in constitutionally protected First Amendment activity, (2) the Defendant's action caused the Plaintiff to suffer an injury that would chill a person of "ordinary firmness" from continuing to engage in the protected activity, and (3) there was a causal relationship between the Plaintiff's protected activity and the Defendant's conduct." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

101. Here, the Plaintiff faced retaliation for voicing his complaints about the harassment he was facing and ultimately resigning as a result as well as his fair housing filings with HUD.

102. Soon after complaining, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Section 1983 of the Civil Rights Act.

103. Defendant subjected Plaintiff to the aforementioned adverse employment actions because of his opposition to the unlawful and discriminatory employment practices of Defendant and its agents in violation of Section 1983 of the Civil Rights Act.

104. Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEOC representative, or otherwise should have known that Plaintiff engaged in the complaint process based on his informal and formal complaint filings.

105. The adverse retaliatory actions to which Plaintiff has been subjected are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

106. Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

107. Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

108. Similarly situated employees (no known prior EEO activity) were not subjected to the same, similar, or any adverse treatment.

109. Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Section 1983 of the Civil Rights Act.

110.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

111.     Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

112.     Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

113.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

114.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

## COUNT IV

**VIOLATION OF SECTION 1983 OF THE CIVIL RIGHTS ACT –
CONSTRUCTIVE DISCHARGE**

115.     Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

116.     Section 1983 of the Civil Rights Act states "it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to

19

discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race."

117.    In violation of Section 1983 of the Civil Rights Act, Defendant  and its agents knowingly and intentionally subjected Plaintiff to constructive discharge because of his race by making threats, sending harassing emails, interfering with funding and health and safe maintenance opportunities for minority residents, publicly telling Plaintiff to shut up, publicly telling Plaintiff to do as he was told or suffer consequences, and failing to remedy the instances of racial discrimination and harassment when Defendant was made aware of them.

118.    Due to the Defendant's conduct and failures, Plaintiff was constructively discharged on November 23, 2019.

## COUNT V

### VIOLATION OF SECTION 1981

119.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

120.    As an African American, Plaintiff is a member of a protected class.

121.    Because of his race (African American), Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1981.

122.    Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiffs employment.

123.    Defendant knew that Plaintiff is an African American prior to the adverse actions described throughout the Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of his race.

20

124.     Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to his race (African American).

125.     Defendant has limited, segregated, and classified Plaintiff in a way that deprived him of employment opportunities and otherwise adversely affected his status as an employee, because of his race (African American).

126.     Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than Plaintiff in the terms and conditions of employment.

127.     Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

128.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

129.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his race (African American).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Jeremy White, respectfully prays that this Court grant him the following relief:

a. Enter a declaratory judgement finding that the foregoing actions of Defendant violated Section 1983 of the Civil Rights Act and Section 1981;

b. Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c.  Award Plaintiff pay for personal and vacation leave and other monetary compensation that he is entitled to under his employment contract; compensatory damages in the amount of $500,000 that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendant alleged herein;

d.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e.  Order such other relief as this Court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: October 24, 2023

Respectfully submitted,

_____

Dionna Maria Lewis, Esq.
District Legal Group, PLLC
Bar No. 19486
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003
Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Jeremy White*